UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
NEW YORK
------------------------------------------------------
DOREEN WHETHERS et. al., Plaintiffs,

**MEMORANDUM AND ORDER**
06-CV-4757(DRH)(MLO)

     -against-

NASSAU HEALTH CARE CORPORATION,
SHARON POPPER, in her official and
individual capacity, RICHARD TURAN, in his
official and individual capacity, MICHAEL H.
MOSTOW, in his official and individual
capacity, KARL KAMPE, in his official and
individual capacity, and PETRA FREESE, in
her official and individual capacity,

                            Defendants.
---------------------------------------------------------X

**A P P E A R A N C E S :**

**For the Plaintiff:**
**LAW OFFICES OF FREDERICK K. BREWINGTON**
556 Peninsula Blvd.
Hempstead, New York 11550
By: Frederick K. Brewington, Esq.

**GORDON & REES LLP**
90 Broad Street, 23rd Floor
New York, NY 10004
By: Deborah Swindells Donovan, Esq.

**For the Defendants Nassau Health Care Corporation, Nassau University Medical
Center, Sharon Popper, Richard Turan, Michael Mostow, Karl Kampe, Petra Freese:**
**CLIFTON BUDD & DeMARIA, LLP**
420 Lexington Avenue
New York, New York 10170
By: Sheryl Ann Orwel, Esq.

**VENABLE LLP**
Rockefeller Center
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
By: Brian J. Clark, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Doreen Whethers ("Whethers" or "plaintiff") commenced this action against defendants Nassau Health Care Corporation ("NHCC"), Sharon Popper, Michael H. Mostow, Karl Kampe, and Petra Freese[1] (collectively, "NUMC defendants"), and defendant Richard Turan ("Turan") asserting claims of race-based discrimination and retaliatory employment practices in violation of 42 U.S.C. § 2000(e) (Title VII), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and New York's Human Rights Law, Executive Law § 296. (Sec. Am. Compl. ¶¶ 1-5, as Defs.' Ex. A). Presently before the Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). For the reasons set forth below, the defendants' motion is granted.

## BACKGROUND

The following facts, drawn from the parties' local Rule 56.1 statements, the pleadings, and prior decisions in this case, are undisputed unless otherwise noted.

*Procedural History*

In an Order dated June 13, 2008, this Court, adopting Magistrate Judge Orenstein's Report and Recommendation in its entirety, granted NUMC defendants' motion pursuant to Federal Rule of Civil Procedure 21 to sever into separate actions the claims of seven plaintiffs, including Whethers, who each claimed that defendants had discriminated against him or her based on race. (*See* Docket No. 64 (Memorandum and Order, dated June 13, 2008)). In the same opinion, the Court also dismissed plaintiffs' Title VI claims in

---

[1] Though Whethers's Second Amended Complaint does not name Petra Freese as a defendant, both parties stipulated that she should be included as a defendant in this action. (*See* Docket No. 90).

their entirety, their Title VII claims against the individual defendants, and all claims against Turan, other than those of Whethers, which were not challenged at that stage in the proceedings. (*Id.* at 14-15.)

*Plaintiff's Employment Responsibilities at NUMC*

Plaintiff began work at Nassau University Medical Center ("NUMC") as a Hospital Record Aide on August 20, 1990. (Whethers Decl. ¶ 3, as Pl.'s Ex. B (hereinafter "Whethers Decl.").) NUMC is part of NHCC, a public benefit corporation created by the New York State Legislature. (Defs.' R. 56.1 Stmt. ¶ 1.) Employees of NUMC, such as plaintiff, are subject to Civil Service Law, pursuant to which "the Civil Service Commission determines the titles, process and method of promotion to higher Civil Service titles." (*Id.* ¶ 2.) In or around March of 1991, plaintiff received the Civil Service title of "Clerk Typist," and she later became a "Clerk Typist I" in 1995. (Whethers Decl. ¶ 3) As a Clerk Typist I, plaintiff's job duties included "performing routine clerical work and filing." (Defs.' R. 56.1 Stmt. ¶ 10.)

In 1999, NUMC established the Office of Diversity to educate and train employees on cultural competency and to investigate complaints of discrimination. (Defs.' 56.1 Statement ¶ 15). At that time, plaintiff became a Diversity Representative of the Office of Diversity and began assisting Clifton Johnson ("Johnson"), who was Director of the Office of Diversity. (Whethers Decl. ¶ 4; Pl. R. 56.1 Stmt. ¶ 17; Johnson Decl. ¶ 3, as Pl.'s Exhibit D (hereinafter "Johnson Decl.").) In addition to the duties of Clerk Typist I, plaintiff's duties included dealing directly with the administration and investigating employee complaints. (Pl.'s R. 56.1 Stmt. ¶ 8; Whethers Dep. at 44-53, as Def.'s Ex. L. (hereinafter "Whethers Dep.").) Plaintiff never received a promotion in her Civil Service Title to reflect her new duties as Diversity Representative. (Whethers Decl. ¶ 13.) In her

new role, however, plaintiff did not suffer a loss in benefits or compensation. (Defs.' R. 56.1 Stmt. ¶ 20.)

*The Board Meeting*

On or about November 18 of 2002, Plaintiff attended an NHCC board meeting where Johnson addressed board members about the disparate treatment of African American employees. (Shaw Decl. ¶ 21, as Pl.'s Ex. C (hereinafter "Shaw Decl.").) He spoke about the hospital's alleged practice of hiring white employees at higher level positions rather than promoting current African American employees or seeking African Americans outside the hospital for these positions. (*Id.* ¶ 21.)

*Transfers of the Office of Diversity*

After the board meeting, NUMC transferred the Office of Diversity to different departments within the hospital three times in approximately two years. In 2002, NHCC first transferred the Office of Diversity from the Office of the General Counsel to the Department of Human Resources. (Defs.' R. 56.1 Stmt. ¶ 22.) NHCC then transferred the Office of Diversity back to the Legal Affairs Department in early 2003. (*Id.* ¶ 28.) Around this time, the plaintiff also began reporting to Col. Vance Shaw, whom NUMC had hired to become the direct supervisor of the Office of Diversity. (Defs.' R. 56.1 Stmt. ¶ 24; Shaw Decl. ¶ 2.) In October 2003, NHCC transferred the Office of Diversity to the Department of Academic Affairs "because of its educational functions regarding cultural competency." (Defs.' R. 56.1 Stmt. ¶ 30.) During the Office's transfers, plaintiff's job responsibilities remained the same.

As a result of its move to Academic Affairs, the Office of Diversity was moved to the Butler building, where all members of the non-managerial Academic Affairs staff maintained their offices. (*Id.* ¶ 32.) Plaintiff describes her work space in the Butler building as a "trailer

shed" exposed to the elements and "infested with ants." (*Id.* ¶ 29.) When she worked in this space, she would meet with complainants in the cafeteria due to this "inadequate" office space. (*Id.* ¶ 29.)

*Plaintiff's Transfer to Medical Records Department*

In February 2004, after plaintiff provided assistance to an employee in the Medical Records department who complained that her supervisor was discriminating against her, NUMC reassigned the plaintiff to the Medical Records Department. (*Id.* ¶ 31.) The hospital asserts that they transferred plaintiff because it had to address departmental shortages after "one hundred and forty-nine employees were laid off from the NHCC for financial reasons." (Defs.' R. 56.1 Stmt. ¶ 43.) In the Medical Records Department, Plaintiff no longer performed the duties of a Diversity Representative, and her new duties were to pull files and copy charts. (Whethers Decl. ¶ 33.)

In May 2004, Plaintiff requested and received a leave of absence. (Whethers Dep. at 140-141.) During her leave of absence, she applied for and received long-term disability benefits because of lupus and rheumatoid arthritis. (Defs.' R. 56.1 Stmt. ¶ 52.) Ultimately, plaintiff did not return to work, but voluntarily retired and currently receives retirement benefits in addition to disability benefits. (*Id.* ¶ 52.)

*The Defendants*

The named defendants were involved in employment decisions affecting plaintiff during the alleged period of discrimination and retaliation at defendant hospital. Richard Turan held the title of NHCC President and Chief Executive Officer until 2004. (Turan Dep. at 7, as Defs.' Ex. M.) Sharon Popper, who reported to Turan, was NHCC's Senior Vice President of Legal Affairs and General Counsel from January 2003 through May 2008.

(Popper Dep. at 8-11, as Defs.' Ex. N.)  She managed all of NHCC's legal issues and affairs, including the Office of Diversity.  (*Id.* at 11-12.)  Karl Kampe served as Vice President of Human Resources from the end of 2002 to December 2003.  (Kampe Dep. at 5, as Defs.' Ex. O.)  He oversaw the Office of Diversity for two months after NHCC transferred the office to the Department of Human Resources in 2002.  (*Id.* at 5.)  Michael Mostow started as the Associate Dean of Academic Affairs and was then promoted to the Dean of Academic Affairs.  (Mostow Dep. at 7, as Defs.' Ex. P.)  He supervised the Office of Diversity when it was transferred to the Department of Academic Affairs in October 2003.  (*Id.* at 8-10.)  Petra Freese has been the Medical Records Director "on and off" since 1981, though she is currently employed at NHCC as Director of Health Information Systems and Admissions Management.  (Freese Dep. at 5-6, as Defs.' Ex. Q.)

*Plaintiff's Current Actions*

On August 30, 2006, plaintiff commenced this action against defendants, seeking injunctive relief and monetary damages.  (Sec. Am. Compl. ¶ 1.)  She seeks damages for past and on-going loss, compensatory damages, pain and suffering, and disbursement costs and fees. (*Id.*)  She brings this action under Title VII of the Civil Rights Act (as amended), 42 U.S.C. §  2000(e) et. seq., 42 U.S.C. §§ 1981 and 1983; the Fourteenth Amendment to the United States Constitution, and New York State's Human Rights Law, Executive Law § 296, and other State causes of action.  (*Id.*)  Defendants move for summary judgment pursuant to Rule 56.  For the reasons stated below, defendants' motion is granted.

## DISCUSSION

## I. Applicable Law and Legal Standards

Summary judgment pursuant to Rule 56 is only appropriate where admissible

evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried.  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts*," Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)),  and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not implausible." *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of N. Y.*, 224 F.3d 149, 157 (2d Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the

nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II. Plaintiff's Discrimination Claim

### A. *Legal Standard*

In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting "formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under McDonnell Douglas and its progeny, a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) she belonged to a protected class, (2) was qualified for the position she held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003). The burden of establishing a *prima facie* case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc*., 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 120 S. Ct. 2097,147 L. Ed. 2d 105 (2000).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [the adverse act]." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted). The

employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

Should the employer satisfy its burden, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non." See *Reeves*, 530 U.S. at 143. To rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998. Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

Finally, "the standards for proving discrimination under Section 296 of the New York Executive Law are the same as under Title VII. *Lucas v. South Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 146 (E.D.N.Y. 2008) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 479, 102 S. Ct. 1883, 72 L. Ed. 2d 262 (1982); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under New York's Human Rights Law "is governed by

10

the same standards as his federal claim")). "Accordingly, the New York Executive Law inquiry is subsumed within the Title VII analysis." *Id.*

**B.** *Application to Plaintiff's Discrimination Claim*

As described above, the Court begins its analysis by determining whether or not the plaintiff has made out a *prima facie* case. The defendants do not contest that the plaintiff, as an African American, is a member of a protected group, nor do they dispute that she was qualified to perform her job. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 11.) Therefore, the Court must consider only whether the plaintiff suffered an adverse employment action, and if so, whether discrimination can be inferred from the defendants' actions.

*Adverse Employment Actions*

The Supreme Court has stated that in order to be actionable under federal discrimination laws, an adverse employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761; 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.") (citation and internal quotation marks omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Materially adverse employment actions also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, . . . or other indices . . . unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citations and internal quotations omitted). However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or

"reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or material adverse employment action. *Ellerth*, 524 U.S. at 761 (internal quotations and citations omitted).

The Second Circuit has spoken regarding the types of employment transfers which may constitute adverse action. The law dictates that "a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Galabya v. N. Y. City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000)). An adverse employment action also may be found where "the plaintiff was transferred from an elite unit to one that was less prestigious or where the transfer effected a radical change in [the] nature of the plaintiff's work." *Id.* (citations and internal quotation marks omitted). In addition, to be materially adverse, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 207 (citations and internal quotation marks omitted). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

Most of the defendants' actions during Whethers's tenure as Diversity Representative do not constitute adverse employment actions. Ms. Whethers did not suffer from a loss in compensation or benefits as a result of the departmental transfers of the Office of Diversity. (*See* Whethers Dep. 55-56 as Def. Ex. L.) In addition, despite the transfers, Ms. Whethers maintained the same job responsibilities, namely performing administrative work and investigations of employee complaints. *See Crady v. Liberty Nat. Bank and Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) (finding that plaintiff did not show that transfer from

12

branch manager position to collections officer position was materially adverse because he did not show that his new responsibilities were "less significant"). While plaintiff alleges that throughout the transfers she often had to report to different supervisors, was separated from her direct supervisor, Clifton Johnson, and sometimes had to perform duties she considered outside of the scope of her responsibilities including employee trainings (*See* Pl.'s Mem. in Opp. to Summ. J. at 6), these working conditions do not amount to a change so significant as to constitute a setback to her career. Therefore, plaintiff's changing supervisors, separation from Johnson, and having to perform tasks outside of her duties as Diversity Representative did not result in any materially adverse employment actions.

Viewing the circumstances in the light most favorable to the plaintiff, however, plaintiff has produced sufficient evidence that her move to the Butler building may constitute an adverse employment action. Plaintiff's allegations that she worked in a trailer shed that was "very small, very cold in temperature, and infested with ants" creates a genuine issue of fact that this transfer amounted to more than a mere inconvenience. A reasonable juror could find that having to endure these conditions constituted a materially adverse employment action. (Whethers Decl. ¶ 29.)

Plaintiff has also presented evidence sufficient to create a genuine triable issue as to whether her final transfer to the Medical Records Department rose to the level of an adverse employment action by materially altering the terms and conditions of her employment in a negative way. As an employee in the Department of Medical Records, Whethers no longer performed the duties of a Diversity Representative, and her responsibilities did not require the skills or qualifications of her civil service title of Clerk Typist I. Her job responsibilities consisted only of pulling files and copying charts, and as such could be considered a change

in responsibilities so significant as to constitute a setback to the plaintiff's career. *See*

*Kessler*, 461 F.3d at 209 (finding that plaintiff created a genuine triable issue on the question

of adverse action because he retained his title in name only and lost all job responsibilities

after his transfer to a different office); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134

(2d Cir. 2008) (finding that employee's transfer from working in pharmacy to working in

parking lot resulted in "significantly diminished material responsibilities").

*Inference of Discrimination*

A Title VII plaintiff may establish the last element of the *prima facie* case in a number

of different ways depending on the specific facts of the case. *See Abdu-Brisson v. Delta Air-*

*Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Here the plaintiff claims that she has established

an inference of discrimination because the defendants "engaged in a pattern of discriminatory

treatment of African-American employees, ignored and condoned complaints of racial

discrimination, and engaged in disparate treatment of Plaintiff Doreen Whethers, without a

valid business reason." (Pl.'s Mem. in Opp. to Summ. J. at 9). Plaintiff, however, does not

raise any material issue of fact to support these claims.

**Pattern of Discriminatory Treatment of African American Employees**

Plaintiff's list of thirteen cases that she claims prove that "NHCC has a documented

history of adverse treatment towards African-Americans" is misleading. (Pl.'s Mem. in

Opp. to Summ. J. at 9). First of all, most of the cases cited are either pending or have

resulted in favorable rulings for the defendant NHCC. In addition, the plaintiff cites cases

relating to all different types of discrimination, including discrimination based on religion

and age. In fact, only two of the cited cases resulted in favorable rulings for the plaintiff,

and these involved plaintiffs who raised claims of discrimination based on disability, age,

and Filipino ethnicity.  (*See Hamad v. Nassau Cnty. Med. Ctr.*, 191 F. Supp. 2d 286

(E.D.N.Y. 2000); *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154 (E.D.N.Y. 1998)).

As a result, any intent to discriminate against African Americans cannot be inferred from

these cases.

**Ignored and Condoned Complaints of Racial Discrimination**

Plaintiff claims that defendants "buried and ignored widespread complaints of racial

discrimination," "discouraged and intimidated Plaintiff and the staff of the Office of

Diversity from investigating claims of racial discrimination," and "pressured Plaintiff not

to pursue and resolve racial discrimination claims."  (Pl.'s Mem. in Opp. to Summ. J. at

12).  While plaintiff alleges this claim with little specificity, she points to the portion of her

declaration stating that under the direction of Popper, she "would no longer be able to meet

with administrative staff as part of [her] investigation."  In citing this statement, plaintiff

seems to argue that by directing her not to meet with staff, defendants ignored

discrimination complaints and prevented the office as a whole from investigating

complaints, but the facts do not support this claim.  As plaintiff describes in the same

paragraph of her declaration, NHCC created a new Office of Diversity position,

Affirmative Action Specialist, and hired Col. Vance Shaw, who had "extensive experience

in diversity awareness and training," to fill this position and meet with staff.  (Whethers

Decl. ¶ 22; Pl.'s Ex. T at 5.)  Therefore, the facts plaintiff cites do not indicate that the

defendants ignored claims of discrimination.

In her declaration, plaintiff makes further allegations that NHCC frustrated her efforts

to resolve discrimination claims, but she does not describe any of these claims with

sufficient detail in order to raise an inference that defendants discriminated against the

plaintiff because she was African American. For example, she states that some of her cases were reassigned to other individuals, but does not describe any of these cases or explain how NHCC ignored them once they were transferred. (Whethers Decl. ¶ 18.) She also states that she was required to attend a meeting regarding fraud detection within the hospital that she claimed "was a complete distraction and diversion from [her] real responsibilities" of investigating complaints, (*Id*. at ¶ 28), and she recounts an instance where Mostow told her to cease her involvement with a discrimination claim because the issue was a "Civil Service and CSEA Union action." (Pl.'s Ex. EE; Whethers Decl. ¶ 31.) Even if a jury could find that defendants intentionally sabotaged Whethers's efforts to resolve issues of employment discrimination, there is nothing in the record to indicate that the cases plaintiff discusses involved discrimination against African Americans. In fact, plaintiff's own declaration asserts that "[t]he function of the [Office of Diversity] was to address alleged workplace discrimination and safeguard employees from *any* form of discrimination." (Whethers Decl. ¶ 7 (emphasis added).) An allegation that defendants may have ignored discrimination complaints, whether based on gender, religion, ethnicity, disability, etc., without more, is insufficient to support an inference that the defendants harbored animus towards African Americans in particular and therefore discriminated against Whethers because of her race.

As a result, the Court finds that plaintiff's claims that defendants ignored and condoned racial discrimination are insufficient to raise an inference of discrimination against the plaintiff because she is African American.

**Defendants' Disparate Treatment of Plaintiff**

Under a disparate treatment theory, a plaintiff can raise an inference of discrimination

16

"by showing that the employer subjected [her] to disparate treatment that is treated [her] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). When considering whether a plaintiff has shown that she was subjected to disparate treatment, the Second Circuit requires that the plaintiff demonstrate that she was "similarly situated in all material respects" to the individuals with whom she seeks to compare herself. *Id.*

Plaintiff claims that the defendants treated her in an unequal manner "involving excessive and purposeful job distractions, adverse employment actions, and inequities in pay when compared to Caucasian employees." (Pl.'s Mem. in Opp. to Summ. J. at 10-11.) Plaintiff includes as examples of this disparate treatment that "[d]efendants resisted the presence of the Office of Diversity from the beginning," adversely relocated Ms. Whethers throughout the Office of Diversity separating her from her supervisor Clifton Johnson, transferred her to inhumane working areas, undermined her work on discrimination cases by overseeing her, denied Ms. Whethers's requests for additional diversity training, and failed to compensate her for overtime. (*Id.* at 11-12) These allegations, however do not provide sufficient evidence that defendants treated her less favorably than similarly situated employees because plaintiff fails to name similarly situated individuals with similar job titles and responsibilities. As a result, these conclusory allegations of discriminatory intent are not sufficient to make out the required *prima facie* case. *See Guerrero v. Fire Dep't, City of N.Y.*, 2009 WL 1563532, at *9 (S.D.N.Y. June 2, 2009) (finding that plaintiff's evidence of unlawful termination insufficient because "conclusory allegations of discrimination, without more" do not meet the requirements under Rule 56(e) in order to defeat a summary judgment motion).

Plaintiff specifically takes issue with the fact that NHCC gave raises to Kampe and Mostow, two white employees who are also named defendants in her suit, and claims that she, too, should have received a raise.  In order to make out a claim of disparate pay, plaintiff must show that "she was paid less than non-members of her class for work requiring substantially the same responsibility" and must in addition produce evidence of "discriminatory animus." *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999) (quoting *Tomka v. Seller Corp.*, 66 F.3d 1295 (2d Cir. 1995)).  Plaintiff, however, has not produced any evidence explaining how Kampe and Mastow, both high level NHCC corporate officers, are similarly situated to her or held substantially similar job responsibilities to the plaintiff other than that they performed "investigative work" for the Office of Diversity.  (Pl.'s R. 56.1 Stmt. ¶ 39.)  Though "a showing that both cases are identical" is not required, a comparison of Kampe and Mastow's positions with that of plaintiff does not amount to a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham*, 230 F.3d at 40.

Finally, plaintiff's claim that administrators at NHCC made comments expressing racial animus towards the plaintiff must fail.  (*See* Pl.'s Mem. in Opp. to Summ. J at 12.)  A plaintiff can demonstrate an inference of discrimination by showing that "the employer criticized the plaintiff's performance in ethnically degrading terms" or "made invidious comments about others in the employee's protected group." *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005).  "A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." *Id.* at 371.

Plaintiff argues that racial animus can be inferred from two of the defendants' comments. First, the plaintiff claims that Petra Freese's comment that Whethers was "only suitable for copying charts" indicated racial animus. (*See* Pl.'s Mem. in Opp. to Summ. J at 12.) Once again, however, plaintiff offers simply a conclusory allegation. While this may have been, to quote plaintiff, "a direct slap to the credentials of the plaintiff," there is no evidence from which to infer that this statement was a critique "in ethnically degrading terms." *Smalls*, 396 F. Supp. 2d at 371.

Plaintiff also cites to Turan's alleged statement in 2002 to Clifton Johnson that he did not want the hospital to turn into a "black hospital." (*See* Pl.'s Mem. in Opp. to Summ. J at 12, fn. 3.) In *Johnson v. County of Nassau*, this Court found that Turan's comment was a "stray remark" that was "insufficient to raise an inference of discrimination because there [was] no nexus between his remark and any of the alleged adverse acts." 480 F. Supp. 2d 581, 599-600 (E.D.N.Y. 2007) (citing *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.")). As in *Johnson*, plaintiff has not explained how this comment could be legitimately tied to any of the alleged adverse actions, especially here where the statement was not made to the plaintiff, but to her supervisor Clifton Johnson. Moreover, a reasonable juror could not find that Whethers was transferred based on her race from Turan's comments alone.

For the reasons stated above, plaintiff has failed to establish the final element of her *prima faci*e case in that she has not presented sufficient evidence that any alleged adverse employment actions occurred under circumstances giving rise to an inference of discriminatory intent. Since plaintiff has failed to satisfy her burden of establishing a *prima*

*facie* case, this Court will not shift the burden over to the employer to offer a legitimate, non-discriminatory reason for its actions. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) ("Once the plaintiff satisfies his initial minimal burden, the burden of production shifts to the employer") (internal quotation marks omitted). Therefore, the Court dismisses plaintiff's Title VII discrimination claims.

## III. Plaintiff's Retaliation Claim

### A. *Legal Standard*

Section 704(a) of Title VII makes it unlawful to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir. 2003) (citing 42 U.S.C. § 2000e-3(a)). "In order to present a prima facie case of retaliation under Title VII . . ., a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find [1] that [] he engaged in protected participation or opposition under Title VII . . ., [2] that the employer was aware of this activity," and "[3] that the employer took adverse action against the plaintiff." *Kessler*, 461 F.3d at 205-06 (internal quotation omitted). In addition, the Supreme Court recently clarified the causation standard required by § 704(a) stating, "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," as distinct from "a motivating factor," which had previously been the standard in the Second Circuit. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 2013 WL 3155234, *16 (June 24, 2013); *Kessler*, 461 F.3d at 206.

Claims of retaliation pursuant to Title VII are analyzed according to the burden-shifting

framework set forth in *McDonnell Douglas*. *See Terry*, 336 F.3d at 141. Once the employee has established a *prima facie* case, the employer "must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the [employee] to demonstrate pretext." *Slattery v. Swiss Reinsurance. Am. Corp*., 248 F.3d 87, 94-95 (2d Cir. 2001).

A plaintiff may establish that she engaged in protected activity under either the opposition clause or the independent participation clause of § 704(a). *Deravin*, 335 F.3d at 203 fn. 6. "The opposition clause requires that the plaintiff has taken, or threatened to take, some action to protest or oppose illegal discrimination." *Correa v. Mana Prods. Inc.*, 550 F. Supp. 2d 319, 327 (E.D.N.Y. 2008) (citing *Deravin*, 335 F.3d at 204). "This can include informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry, and expressing support of co-workers who have filed formal charges." *Id*. (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). The court interprets the participation clause more broadly, and the plaintiff must show only that she participated in an investigation, proceeding, or hearing "in any manner." *Deravin*, 335 F.3d at 203.

An employee, however, "does not receive special protection under Title VII simply because the employee handles discrimination complaints" as part of her job. *Correa*, 550 F. Supp. 2d at 330. "In order for employees in human resources positions to claim retaliation they need to first clearly establish that they were engaged in protected activities other than the general work involved in their employment." *Id*. "In cases where it is a third party [like plaintiff] who is attempting to help the alleged victim of discrimination assert her rights, 'protected activity' is limited to activity that is adverse to the company, or outside the

employee's normal employment role; this would include the filing of a complaint, but not reporting suspected discrimination to a supervisor." *Vidal v. Ramallo Bros. Printing, Inc.*, 380 F. Supp. 2d 60, 62 (D. P. R. 2005). As a result, "[a] plaintiff who has not opposed any action of the employer or assisted an employee with the filing of a grievance with an outside agency cannot retroactively use her position to assert protected activity." *Correa*, 550 F. Supp. 2d at 331.

## B. *Application to Plaintiff's Retaliation Claim*

Most of plaintiff's allegations that she engaged in protected activity do not present a *prima facie* case that she opposed discrimination or engaged in any investigation or proceeding relating to discrimination that was outside of her job description. For example, she claims that she provided Sharon Popper with a document containing open and viable discrimination claims. (Pl.'s Mem. in Opp. to Summ. J. at 16.) This activity, however, is clearly within the plaintiff's duties as a representative of the Office of Diversity to present cases of discrimination to upper management and does not constitute a protected activity. (*See* Johnson Decl. ¶ 7 ([T]he office "served a dual function of investigating claims of discrimination to determine whether such claims had merit, and presenting to management those claims that did have merit.")

Plaintiff also claims that she wrote to legislators, politicians, and board members as to the working conditions of African Americans. The record, however, states only that plaintiff's letters addressed issues that the Office of Diversity faced regarding alleged lack of "supplies" and "adequate office items, including computers and staff." (Johnson Decl. ¶ 6.) The record makes no mention of how this lack of supplies related to the defendants' alleged discrimination against African Americans as prohibited by Title VII. Plaintiff could have

22

provided these actual correspondences for the record, but without them she does not raise any question of fact as to whether she acted outside of her employment in opposing a discriminatory practice.  Similarly, the plaintiff claims that she publicly expressed support for an elected official who spoke out on behalf of employees facing termination at NHCC, but does not offer any evidence regarding the circumstances of this support or any facts to suggest that this official's position had anything to with the alleged discriminatory policies of NHCC.  (Whethers Decl. ¶ 31.)  In addition, although plaintiff claims in her legal memorandum that she assisted employees in drafting and filing complaints to the New York Department of Human Resources (NYDHR) (Pl.'s Mem. in Opp. to Summ. J. at 16), the evidence in the record makes no mention of this activity.  Furthermore, that plaintiff was present when Clifton Johnson publicly expressed disapproval of the way the defendants were handling discrimination claims is not evidence that the plaintiff herself opposed or took any action against the defendants' policies.  (*Id*. at 18-19.)

Further, plaintiff claims that she engaged in protected activity by helping to "create" the Office of Diversity in response to concern from outside organizations.  (*Id*. at 18; Whethers Decl. ¶ 6.)  There is no evidence, however, that helping to create the Office of Diversity was an action adverse to the employer since NHCC itself, according to the plaintiff, actually "instituted" the office as part of its efforts "to address workplace discrimination and safeguard employees from any form of discrimination."  (Whethers Decl. ¶¶ 6-7.)  Therefore, this fact by itself is not enough to raise a genuine issue of fact that plaintiff engaged in any protected activity that was adverse to the employer.

Plaintiff also alleges that she notified Ann Johnson of Human Resources "as to the racial motivated discrimination she endured," but that allegation appears solely in her brief.

(Pl.'s Mem. in Opp. to Summ. J. at 18.)  The record states only that plaintiff spoke to Ms.

Johnson regarding the alleged comments that Petra Freese made regarding plaintiff's

suitability for copying charts.  (Whethers Decl. ¶ 33.)  There is no evidence in the record

that this conversation entailed anything more, particularly anything relating to the plaintiff's

concerns that NHCC was discriminating against her because of her race.

The plaintiff alleges two activities that do raise a genuine issue of material fact as to

whether she engaged in protective activity.  First, plaintiff claims that after she was already

transferred to the Medical Records Department, she advised employees who complained to

her about discrimination to seek an attorney.  (*Id.* ¶ 38.)  A reasonable juror could find that

this activity was outside of plaintiff's scope of employment in the Medical Records

Department and adverse to the employer.  This activity, however, occurred after plaintiff

was already transferred to the Medical Records Department, and therefore, after the alleged

retaliatory actions occurred.  As a result, this activity could not have been a but-for cause of

the defendants' alleged retaliatory actions.  *See Univ. of Tex. Southwestern Med. Ctr.*, 2013

WL 3155234, at * 16.  Similarly, while plaintiff sent a letter to Popper complaining about

the decision to transfer her back to the Medical Records Department (Pl.'s Ex. HH), this

action also occurred after the decision to transfer plaintiff had already been made.

Therefore, Ms. Whethers has failed to make out a *prima facie* case of retaliation.  As a

result, the Court will not shift the burden to the defendants to articulate a legitimate reason

for their actions.

## IV. Plaintiff's 42 U.S.C. §§ 1981 and 1983 Claims

### A.  *Legal Standard*

42 U.S.C. § 1981 provides that all persons within the jurisdiction of the United States

shall have the right "to make and enforce contracts." This section prohibits discrimination "with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d. Cir. 2004) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68-69 (2d Cir. 2000)). 42 U.S.C. § 1983 allows an individual to bring an action against a "person, who, under color of any statute, ordinance, regulation, custom or usage, of any State...subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Though plaintiff raises it as a separate claim (Sec. Am. Compl. ¶¶ 80-105), it is not itself a substantive right, but provides a method for vindicating federal rights, such as equal protection under the Fourteenth Amendment. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

## B. *Application to Plaintiff's Discrimination Claim*

The *McDonnell Douglas* analysis applies to both Title VII discrimination claims and claims under § 1981. *Johnson*, F. Supp. 2d at 605. As a result, since plaintiff has not provided sufficient evidence to meet even the minimal burden of establishing a *prima facie* claim of discrimination under Title VII, her claims under § 1981 must fail as well. *See id.* (quoting *Patterson*, 375 F.3d at 225) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 . . . and the factors justifying summary judgment dismissing Patterson's Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983.")

## C. *Application to Plaintiff's Retaliation Claim*

Similarly, retaliation claims under § 1981 are generally analyzed in the same manner as under Title VII. *Acosta v. City of New York*, 2012 WL 1506954 at *8 (S.D.N.Y. Apr. 26, 2012) ("Claims of retaliation under [Title VII and § 1981] are generally analyzed in the same way, with the same standards of liability."). Since this Court has dismissed plaintiff's retaliation claim, her § 1981 retaliation claim is also dismissed.

**D.** *First and Fourteenth Amendment Claims*

Count IV of the plaintiff's complaint alleges violations of her rights to "free speech, free association, equal protection, and due process." (Sec. Am. Compl. ¶ 123.) Plaintiff's only mention of a free speech claim is that defendants "retaliated against the Plaintiff and staff of the Office of Diversity for exercising speech of public concern about widespread discrimination within Defendant NHCC." (Pl.'s Mem. in Opp. to Summ. J. at 24.) Plaintiff fails to allege any specific instances of speech or any way that the defendants infringed on her rights. Further neither the plaintiff's brief nor the record make any mention of how defendants infringed on her right to associate. These claims are, therefore, dismissed.

In terms of how the Court should analyze plaintiffs' Equal Protection claim as compared to its Title VII claim, the plaintiff concedes that "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together." (*Id.* at 23 (citing *Feingold*, 366 F.3d at 159).) Here, they both must fall. In addition, to the extent plaintiff's § 1983 claim is predicated on a violation of the Due Process Clause of the Fourteenth Amendment, her claim is dismissed as there is no evidence that plaintiff, who by her own admission "voluntarily retired" (Defs.' R. 56.1 Stmt. ¶ 52; Pl.'s Opp. to Defs.,' R. 56.1 Stmt. ¶ 52), was deprived of a property or liberty interest. *See Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) ("To state a Section 1983 claim [premised upon a due process

violation], a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process.).

## *CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment pursuant to Rule 56 is granted in its entirety. Plaintiff's claims under 42 U.S.C. § 2000(e) et. seq. (Title VII), 42 U.S.C. §§ 1981 and 1983, and New York's Human Rights Law, Executive Law § 296 are dismissed.

**SO ORDERED.**

Dated: Central Islip, New York

July 8, 2013

_____/s/_____

Denis R. Hurley

United States District Judge